**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**STATESVILLE DIVISION**
**CASE NO. 5:16-CV-00025-RLV-DCK**

| | | |
|---|---|---|
| DAVID KRISTOPHER OWLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **ORDER** |
| | ) | |
| GEORGE T. SOLOMON, Director of Prisons/Director of North Carolina Department of Public Safety, NORTH CAROLINA DEPARMENT OF PUBLIC SAFETY, FRANK PERRY, Secretary, North Carolina Department of Public Safety, PAULA SMITH, M.D., Director of Medical Services, SUSAN WHITE, Administrator, Alexander Correctional institution, ERIC DYE, Assistant Superintendent, Alexander Correctional Institution, RAYMOND L. HAMILTON, Captain, Alexander Correctional Institution, STEPHANIE MILLER, Sergeant, Alexander Correctional Institution, JOSHUA QUINN, Sergeant, Alexander Correctional Institution, WILLIAM FARRIS, Unit Manager, Alexander Correctional Institution, AMY JENKINS, Case Manager, Alexander Correctional Institution, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

     **THIS MATTER IS BEFORE THE COURT** on Defendants' Motion for Summary Judgment. (Doc. 18). Also before the Court is Defendants' Motion to Strike Document 32-2, which includes the affidavit of Plaintiff's Counsel, Mary March Exum, and an unsworn, draft affidavit that Plaintiff's Counsel alleges is representative of conversations she had with Sergeant Richard Wilson. (Doc. 34). Having been fully briefed (*See* Docs. 19, 32-33, 35, 37-38), both Motions are now ripe for disposition. For the reasons stated below, Defendants' Motion to Strike

(Doc. 34) is **GRANTED IN PART** and **DENIED IN PART** and Defendants' Motion for Summary Judgment (Doc. 18) is **GRANTED**.

## I.    BACKGROUND

Plaintiff David Kristopher Owle, a North Carolina inmate who suffers from sleep apnea, filed a three-count action alleging that Defendants denied him access to medical care when, for nine nights, they failed to place him in a cell with an electrical outlet so that he could operate his Continuous Positive Airway Pressure ("CPAP") Machine. At all times relevant to this action, Plaintiff was housed at Alexander Correctional Institution ("ACI"). (*See* Doc. 32-1). Plaintiff was initially diagnosed with sleep apnea in July 2008 and first obtained a CPAP Machine in October 2008. (Doc. 20-15 at 3-4; Doc. 32-1 at 2). In March 2015, Plaintiff was housed in the Green Unit at ACI. (Doc. 20-5 at 2-3; Doc. 32-1 at 3). On the morning of March 29, 2015, prison staff, led by Defendant Stephanie Miller, the Green Unit Sergeant-on-Duty, ordered inmates housed in the Green Unit to relocate to cells in the Red Unit. (Doc. 20-5 at 3; Doc. 32-1 at 3).

Upon receiving the order to move to the Red Unit, Plaintiff, who had an electrical outlet in his Green Unit cell, expressed concern to Defendant Miller about whether his new cell in the Red Unit would also have an electrical outlet. (Doc. 20-5 at 3; Doc. 32-1 at 3). Defendant Miller advised Plaintiff that he would need to discuss the matter with the Red Unit Sergeant-on-Duty. (Doc. 20-5 at 3; Doc. 32-1 at 3). Upon arriving in the Red Unit, Plaintiff found that there was no electrical outlet in his new cell. (Doc. 32-1 at 3). Plaintiff spoke with Officer Bowlin, who escorted Plaintiff to Defendant Joshua Quinn, the Red Unit Sergeant-on-Duty. *Id.* Defendant Quinn informed Plaintiff that he would put a maintenance work order in for the electrical order and Quinn attests that he did so that day. *Id.*; (Doc. 20-4 at 2). Later that day, Plaintiff alleges he spoke with Defendant Richard Hamilton, a Captain at ACI, about the lack of an electrical outlet

and that Defendant Hamilton informed Plaintiff that he would put a work order in for the outlet.[1]
(Doc. 32-1 at 3). No one from the maintenance department installed the electrical outlet on March
29, 2015. *See id.* at 3-4.

On March 30, 2015, Plaintiff spoke with another officer on the Red Unit about his need for
an electrical outlet so that he could use his CPAP machine at night. *Id.* at 4. March 30, 2015 and
March 31, 2015 both came and went without the maintenance department installing an electrical
outlet.[2] *See id.* On March 31, 2015 or April 1, 2015, Plaintiff spoke with Brent Milsaps and Tass
Jansen, supervisors at Plaintiff's prison-work job, about the lack of an electrical outlet in his cell.
*Id.*; (Doc. 20-10 at 2). In response, Tass Jansen contacted the maintenance department about the
issue and was informed that a work order had been placed and that the electrical outlet would be
installed. (Doc. 20-9 at 2; Doc. 32-1 at 4). As of the night of April 1, 2015, Plaintiff remained
without an electrical outlet in his cell. (Doc. 32-1 at 4). On April 2, 2015, Plaintiff spoke with
Defendant Amy Jenkins, Plaintiff's case worker at ACI, about the electrical outlet. *Id.* at 4-5; (*see
also* Doc. 20-6 at 3). Defendant Jenkins allegedly contacted Defendant Quinn regarding Plaintiff's
need for an electrical outlet in his cell. (Doc. 32-1 at 5; Doc. 20-4 at 3; Doc. 20-6 at 3). Also on
April 2, 2015, Plaintiff spoke with custody staff members about the electrical outlet; nonetheless,
as of Monday, April 6, 2015, no electrical outlet had been installed in Plaintiff's cell. (Doc. 32-1
at 5-7).

---

[1] Defendant Hamilton denies ever speaking with Plaintiff about the outlet and has submitted timesheets showing that
he did not work at ACI on March 29, 2015. (Doc. 20-7 at 2-3, 6).

[2] Plaintiff, who was working as a furniture upholsterer in the prison, attests that exhaustion and worry caused him to
staple his hand twice while at work on March 31, 2015. (Doc. 32-1 at 4). Although Plaintiff further attests that he
submitted a "workman's compensation claim" regarding his hand injury, *id.*, Plaintiff has not produced any
documentation substantiating his attestation that the injury occurred or any evidence regarding the severity of the
injury. Furthermore, Plaintiff's immediate job supervisor does not recall Plaintiff reporting an injury to his hand on
or about March 30, 2015 (Doc. 20-10 at 2), and timesheets establish that Plaintiff worked an eight hour day on March
31, 2015 and that he attended his job on April 1, 2015 and on April 2, 2015 (Doc. 20-9 at 5).

On April 6, 2015, Plaintiff spoke with several employees at ACI, one of whom advised Plaintiff to write a letter to Defendant Eric Dye, Assistant Superintendent of ACI. *Id.* at 7. Plaintiff followed this advice and Defendant Dye received Plaintiff's letter on April 7, 2015.[3] *Id.* at 7; (Doc. 20-11 at 3, 7). On April 7, 2015, Plaintiff was placed in a restricted housing unit cell that had an electrical outlet and he remained in the restricted housing unit cell until the maintenance department installed an electrical outlet in his Red Unit cell. (Doc. 20-11 at 3; Doc. 32-1 at 7-8). An outlet was installed in Plaintiff's Red Unit cell by April 9, 2015, and Plaintiff was returned to his Red Unit Cell that afternoon. (Doc. 32-1 at 8).

On or about July 26, 2015, Plaintiff completed a Form DC-410 regarding the lack of access to an electrical outlet between March 30, 2015 and April 7, 2015, and addressed the Form DC-410 to the state offices of Defendant North Carolina Department of Public Safety ("NCDPS") in Raleigh, North Carolina. (Doc. 20-2 at 4, 33-36). On his Form DC-410, Plaintiff, in a manner consistent with the aforementioned facts, discusses his interactions with Defendants Miller, Quinn, Hamilton, and Dye.[4] (Doc. 20-2 at 33-35). Plaintiff, through the Form DC-410, also alleged that he filed an earlier grievance, which he claims he handed to Defendant Farris but which he further claims was never processed by Defendant Susan White, an administrator at ACI. *Id.* at 35-36. Plaintiff's Form DC-410 was eventually received by Defendant White, who submitted the grievance for processing on August 20, 2015. *Id.* at 4, 31.

Plaintiff initiated the instant three count action under 42 U.S.C. § 1983. (*See* Doc. 1). Count One of Plaintiff's action alleges that each of the Defendants violated his Eighth Amendment

---

[3] In his affidavit, Plaintiff terms the letter he sent Defendant Dye a "grievance letter." (Doc. 32-1 at 7). The letter, however, is not marked as such and Plaintiff does not attest that he included an official grievance form, known as a Form DC-410, with his letter to Defendant Dye. (*See* Doc. 20-11 at 7; Doc. 32-1 at 7; *see also* Doc. 20-2 at 21).

[4] Plaintiff's Form DC-410 also discusses an April 7, 2015 interaction he had with Defendant William Farris, a Unit Manager at ACI, shortly before being transferred to a cell in the restricted housing unit. (Doc. 20-2 at 34-35).

right to be free from cruel and unusual punishment when, for nine nights, they denied him access to medical care by failing to provide him an electrical outlet to operate his CPAP machine. *Id.* at 10-13. Count Two of Plaintiff's action alleges that Defendants NCDPS, George T. Solomon (Director of Prisons and of NCDPS), Frank Perry (Secretary of NCDPS), Paula Smith, M.D. (Director of Medical Services), Dye, and White violated his Eighth Amendment rights by failing to train personnel at ACI regarding how to address the medical needs of prisoners. *Id.* at 13-16. Count Three of Plaintiff's action seeks punitive damages. *Id.* at 16.

Defendants filed a Motion for Summary Judgment (Doc. 18). In the memorandum supporting their Motion for Summary Judgment, Defendants argue that (1) Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA"), *see* 42 U.S.C. § 1997e; (2) Defendants Dye, Hamilton, Miller, Quinn, Farris, and Jenkins took appropriate action given their knowledge of Plaintiff's medical condition; (3) Plaintiff did not present evidence that he suffered any significant injury from being denied an electrical outlet such that he failed to satisfy the objective component of an Eighth Amendment claim; (4) imposition of supervisory liability on Defendants Solomon, Perry, Smith, and White is not appropriate; (5) the individual Defendants are entitled to qualified immunity; (5) Defendant NCDPS is not a "person" for purposes of § 1983 and is entitled to sovereign immunity; and (6) Plaintiff failed to present evidence of reckless or callous indifference to support his claim for punitive damages. (Doc. 19 at 15-25). In response, Plaintiff identifies several factual disputes he asserts are material and contends that NCDPS prevented him from using the grievance process by not processing a grievance he filed at the time of the events giving rise to this action. (Doc. 32 at 1-8). In support of his response, Plaintiff submitted his own affidavit (Doc. 32-1), as well as an affidavit from his counsel, Mary March Exum, and an unsworn, draft affidavit of Sergeant Wilson, a custody officer

at ACI (Doc. 32-2). Ms. Exum represents that she drafted the unsworn affidavit based on conversations she had with Sergeant Wilson and that Sergeant Wilson was prepared to sign the unsworn, draft affidavit until he and two other ACI custody officers were retaliated against by NCDPS and NCDPS employees. *Id.* at 1-4.

In addition to filing a reply on the Motion for Summary Judgment (Doc. 33), Defendants filed a Motion to Strike Doc. 32-2 (Doc. 34). In support of the Motion to Strike, Defendants argue that (1) the unsworn, draft affidavit does not comply with Fed. R. Civ. P. 56;[5] (2) the unsworn, draft affidavit conflicts with Sergeant Wilson's sworn affidavit attached to Defendant's Reply on the Motion for Summary Judgment as Document 33-3; (3) most of Ms. Exum's affidavit is inadmissible hearsay and conclusory opinions not based on personal knowledge;[6] and (4) Ms. Exum cannot serve as a witness and as counsel, such that her affidavit cannot be considered for purposes of summary judgment because her statements cannot be reduced to admissible testimony at trial. (Doc. 35 at 1-5; Doc. 38 at 1-7). In response to the Motion to Strike, Plaintiff argues that the statements in Ms. Exum's affidavit can be reduced to admissible evidence at trial and that "shenanigans created by the defendants" and misleading statements by attorneys representing NCDPS caused Sergeant Wilson to sign the affidavit attached as Document 33-3 rather than the affidavit drafted by Ms. Exum. (Doc. 36 at 2).

---

[5] Defendant's Motion to Strike cites an outdated version of Fed. R. Civ. P. 56, which was last amended in 2010. Although the exact language relied on by Defendants no longer exists within Rule 56, many of the standards for affidavits in what was Rule 56(e) presently exist within Rule 56(c).
[6] Specifically, Defendants contend that the Court should strike paragraphs 5-11, 13-14, 17-20, and 23-24 under this rationale. (Doc. 35 at 5).

## II.     DISCUSSION

### A.     Motion to Strike

In litigating a motion for summary judgment, "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including . . . affidavits . . . ." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "'It is well established that unsworn, unauthenticated documents cannot be considered on a motion for summary judgment.'" *Hamilton v. Mayor & City Council of Baltimore*, 807 F. Supp.2d 331, 352 (D. Md. 2011) (quoting *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)). Furthermore, "[a] party's mere 'belief' and/or speculation is not based on personal knowledge and is not competent summary judgment evidence." *Riley v. Univ. of Ala. Health Servs. Found., P.C.*, 990 F. Supp.2d 1177, 1187 (N.D. Ala. 2014). Instead, "[f]or a matter to be considered within a witness's personal knowledge, it must be 'derived from the exercise of his own senses, not from the reports of others—in other words, it must be founded on personal observation.'" *Id.* (brackets omitted) (quoting *United States v. Evans*, 484 F.2d 1178, 1181 (2d Cir. 1973). Based on Fed. R. Civ. P. 56(c)(4)'s personal knowledge requirement, as well as the requirement that facts be admissible in evidence, "hearsay evidence, which is inadmissible at trial, cannot be considered on a motion for summary judgment." *Maryland Highways Contractors Ass'n, Inc. v. Maryland*, 933 F.2d 1246, 1251-52 (4th Cir. 1991). Finally, "[s]tatements in affidavits made only on belief or on information and belief may not be considered in support of or in opposition to summary judgment." *United States v. Rocky Mountain Holdings, Inc.*, 782 F. Supp.2d 106, 114 (E.D. Pa. 2011) (internal quotation marks omitted).

"'An affidavit that does not measure up to the standards of Rule 56[(c)] is subject to a motion to strike.'" *Lumoa v. Potter*, 351 F. Supp. 2d 426, 430 (M.D.N.C. 2004) (quoting *Noblett v. Gen. Elec. Credit Corp.*, 400 F.2d 442, 445 (10th Cir. 1968)). When considering a motion to strike a document because the document does not comply with Fed. R. Civ. P. 56(c), a court must "use 'a scalpel, not a butcher knife,' to strike only those portions of an affidavit that do not satisfy the requirements of Rule 56(c)." *Colfield v. Safeway Inc.*, 2016 WL 1242592, at *4 (D. Md. Mar. 30, 2016) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 593 (6th Cir. 2009)). Additionally, "the papers of a party opposing summary judgment are usually held to a less exacting standard than those of the moving party and doubts regarding admissibility are resolved in favor of the party opposing summary judgment." *Id.* (internal quotation marks and citation omitted).

Applying the standards of Fed. R. Civ. P. 56(c) and the standards governing a motion to strike, it is abundantly clear that several portions of Document 32-2 must be stricken. The affidavit of Sergeant Wilson drafted by Ms. Exum (Doc. 32-2 at 5-7) does not comply with the requirement that an affidavit be sworn or authenticated because Sergeant Wilson did not sign the document. Furthermore, where portions of the draft affidavit are incomplete and in brackets, the draft affidavit is speculative rather than based on the personal knowledge of anyone, including Sergeant Wilson. Finally, although Plaintiff contends that the draft affidavit is submitted for the purpose of corroborating Ms. Exum's affidavit, the draft affidavit completely fails to provide any meaningful corroboration. First, as the unsworn affidavit was drafted by Ms. Exum, the representations in the document are only as credible as the attestations in Ms. Exum's own affidavit. Second, Sergeant Wilson has sworn to an affidavit disavowing the contents of the draft affidavit. (Doc. 33-2 at 2). Accordingly, Defendants' Motion to Strike (Doc. 34) is **GRANTED** with respect to the unsworn, draft affidavit of Sergeant Wilson and the Court **STRIKES** pages 5-7 of Document 32-2.

Turning next to Ms. Exum's affidavit, the Court initially questions whether Ms. Exum is competent to testify to the matters in her affidavit. Under the North Carolina Rules of Professional conduct,

> A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
> (1)    the testimony relates to an uncontested issue;
> (2)    the testimony relates to the nature and value of legal services rendered in the case; or
> (3)    disqualification of the lawyer would work substantial hardship on the client.

N.C. Revised Rule of Professional Conduct 3.7. Plaintiff has not expressed any intent to obtain new counsel or to proceed *pro se* to avoid application of Rule 3.7 relative to Ms. Exum's proposed testimonial statements. It is not apparent that any of the exceptions in Rule 3.7 apply.[7] Furthermore, and in line with Rule 3.7, the United States Court of Appeals for the Fourth Circuit has concluded that it is "improper" for a court to view an affidavit of counsel on a contested issue as "substantive evidence" because "[i]t is elementary that counsel may not participate both as an advocate and as a witness, absent special circumstances." *Spivey v. United States*, 912 F.2d 80, 84-85 (4th Cir. 1990).

This Court would be well within its discretion to strike Ms. Exum's affidavit in its entirety based on her role as counsel for Plaintiff. However, in light of (1) the general inclination against striking evidence put forth by a non-moving party, (2) the possibility that Ms. Exum may be able to elicit the substance of some of her statements through the examination of witnesses at trial, and (3) the fact that stronger justifications support striking significant portions of Ms. Exum's affidavit, the Court will decline to strike Ms. Exum's affidavit based solely on her role as Plaintiff's counsel.

---

[7] Because Sergeant Wilson signed an affidavit contradicting Ms. Exum's affidavit, the statements in Ms. Exum's affidavit are not "uncontested." Ms. Exum's affidavit clearly does not relate to the value of her legal services. Lastly, while a change in counsel might cause some hardship to Plaintiff, Plaintiff does not present a "substantial hardship" argument in response to Defendants' Motion to Strike. (*See* Docs. 36).

However, reviewing Ms. Exum's affidavit paragraph by paragraph, the Court concludes that paragraph 24 is based on speculation rather than Ms. Exum's personal knowledge. Therefore, paragraph 24 does not comply with the requirements of Fed. R. Civ. P. 56(c)(4). Furthermore, some allegations in paragraph 7 are based on double-hearsay rather than Ms. Exum's personal knowledge and do not appear reducible to an admissible form at trial, even through the examination of Sergeant Wilson. Finally, all or part of paragraphs 3, 5, 6, 10, 13, 14, 16, 17, 18, 19, 20, 21, and 23 are hearsay. The portions of those paragraphs that advance representations about Ms. Exum's out-of-court statements to others are stricken because it does not appear that the substance of these statements could be admissible at trial. As to statements allegedly made by Sergeant Wilson and by Ms. Starnes, the Court, in light of the less exacting standard imposed on the non-moving party and the fact that consideration of the statements do not alter the Court's disposition of Defendants' Motion for Summary Judgment, will view the statements as a potential proffer as to testimony the Court might receive from Sergeant Wilson and Ms. Starnes at trial. Accordingly, Defendants' Motion to Strike (Doc. 34) is also **GRANTED** with respect to paragraphs 3, 5, 6, 7, 10, 13, 14, 16, 17, 18, 19, 20, 21, 23, and 24 and those paragraphs are **STRUCK** in accordance with the aforementioned reasoning.[8] Defendants' Motion to Strike (Doc. 34), however, is **DENIED** with respect to (1) non-hearsay statements in the above identified paragraphs; (2) paragraphs 1, 2, 4, 8, 9, 11, 12, 15, 22, 25, and 26 of Ms. Exum's affidavit; and (3) pages 10 and 11 of Doc. 32-2.

---

[8] The Court strikes all or part of these paragraphs because the paragraphs clearly do not satisfy the requirements of Fed. R. Civ. P. 56. However, even considering the stricken materials, the Court would, nevertheless, grant Defendants' Motion for Summary Judgment.

B.    Motion for Summary Judgment

    i.    *Standard of Review*

Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In order to support or oppose a summary judgment motion, a party is required to cite to "materials in the record, including depositions, documents, . . . affidavits or declarations, . . . admissions, interrogatory answers, or other materials;" or show "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) (applying former version of Rule 56); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (same).

It is well-established that the mere existence of "some" factual disputes will not defeat summary judgment; rather, the dispute presented must be "genuine" and concern "material" facts. *Anderson*, 477 U.S. at 247-248 (emphasis in original); *see also Emmett v. Johnson*, 532 F.3d 291, 297 (4th Cir. 2008).  Only disputes over facts that might affect the outcome of the suit under relevant governing law fall within the category of "genuine" and "material" facts.  *See Fields v. Verizon Servs. Corp.*, 493 Fed. App'x 371, 374 (4th Cir. 2012).  A dispute is "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Dulaney v. Packaging Corp. of Am.*, 673 F.3d 323, 330 (4th Cir. 2012).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson*, 477 U.S. at 248.

Abstract or conjectural doubts, minor discrepancies, and points irrelevant to the "material" facts are not genuine or material, and such do not cast sufficient doubt on the validity of testimony as to preclude the entry of summary judgment.  *Emmett*, 532 F.3d at 297; *Hux v. City of Newport*

*News, Va.*, 451 F.3d 311, 315 (4th Cir. 2006). The non-movant cannot demonstrate a triable issue of disputed fact by building one inference upon another. *Emmett*, 532 F.3d at 297 (citing *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)). Although it is certainly true that "the facts and all reasonable inferences must be viewed in the light most favorable to the non-moving party," *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (en banc), it is equally true that a court is "well within its discretion in refusing to ferret out the facts that counsel has not bothered to excavate." *Cray Commc'ns. Inc. v. Novatel Comput. Sys., Inc.*, 33 F.3d 390, 396 (4th Cir. 1994).

> ii.   *Sovereign Immunity*

Defendant NCDPS contends that, as an agency of the state, it is not subject to suit under 42 U.S.C. § 1983 because it is not a "person" and that it is entitled to Eleventh Amendment sovereign immunity. (Doc. 19 at 24). Plaintiff does not respond to either of NCDPS's contentions. (*See* Doc. 32).

The Eleventh Amendment states that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign States." U.S. Const. amend. XI. The Eleventh Amendment has been interpreted to make "an unconsenting State . . . immune from suits brought in federal courts by her own citizens as well as by citizens of another State." *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974). The immunity against suit provided by the Eleventh Amendment "extends . . . to state agencies and other government entities properly characterized as arms of the state." *Gray v. Laws*, 51 F.3d 426, 430 (4th Cir. 1995) (brackets and internal quotation marks omitted). There can be no dispute that the NCDPS is a state agency and an arm of the State of North Carolina; therefore, NCDPS is entitled to sovereign

immunity against suits for monetary damages and all claims against Defendant NCDPS are **DISMISSED WITH PREJUDICE**.[9]

### iii. *Exhaustion of Administrative Remedies*

Defendants contend that Plaintiff failed to properly exhaust his administrative remedies as to all of the individual Defendants because the Form DC-410 Plaintiff submitted in July 2015 was untimely under the relevant NCDPS Administrative Remedy Procedure.[10] (Doc. 19 at 15-16). In response, Plaintiff asserts that he filed a "grievance letter" on April 7, 2015, but that the letter was never processed. (Doc. 32 at 8; Doc. 32-1 at 7-8). Thus, Plaintiff contends that the failure to process his April 7, 2015 grievance letter deprived him of the opportunity to fully present his claims administratively and defeats Defendants' failure to exhaust argument. (Doc. 32 at 6-8).

Failure to exhaust administrative remedies is an affirmative defense on which a defendant has the burden of proof. *See Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008). Under the PLRA, a prisoner must exhaust all available administrative remedies provided by the state prison system before bringing a legal action that challenges prison conditions or seeks monetary damages. *Woodford v. Ngo*, 548 U.S. 81, 85 (2006); *see also* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative

---

[9] Additionally, 42 U.S.C. § 1983 does not provide a cause of action against NCDPS. Section 1983 of Title 42 creates a cause of action to remedy deprivations of rights, privileges, and immunities secured by the Constitution or by federal law, by a "*person*" acting under color of state law. *See Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 658 (4th Cir. 1998). A state agency is not a "person" under § 1983 and, therefore, is not subject to suit under § 1983. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 63-66, 71 (1989). Accordingly, to the extent Plaintiff seeks non-monetary relief in the form of declaratory and injunctive relief (Doc. 1 at 16-17), § 1983 does not provide a cause of action as to NCDPS for any relief. Furthermore, declaratory relief is not proper where, as here, a plaintiff's claim rests entirely on past events and a past injury. *See Dyer v. Md. State Bd. of Educ.*, 187 F. Supp.3d 599, 609-10 (D. Md. 2016).

[10] Defendants Solomon, Perry, Smith, and Jenkins further contend that even if Plaintiff's July 2015 grievance satisfies the exhaustion requirement as to some Defendants, the July 2015 grievance does not make any allegations against them and cannot satisfy the exhaustion requirement as to Plaintiff's claims against them. (Doc. 19 at 16-17).

remedies as are available are exhausted."). To exhaust all available administrative remedies, a prisoner must "us[e] all steps that the agency holds out, and do[] so *properly . . . .*" *Woodford*, 548 U.S. at 90 (emphasis in original). "Proper exhaustion demands *compliance with an agency's deadlines and other critical procedural rules* because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90-91 (emphasis added). The requirement that a prisoner exhaust his administrative remedies before filing suit (1) "gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court and it discourages disregard of the agency's procedures" and (2) "promotes efficiency" by allowing claims to be resolved or narrowed through agency proceedings rather than in federal court. *Id.* at 89. The requirement that a prisoner must properly exhaust his remedies exists namely to regulate those "parties who do not want to exhaust [administrative remedies]" and to "give the agency a fair and full opportunity to adjudicate [the prisoner's] claim." *Id.* at 90.

An exception to the proper exhaustion requirement exists when a prisoner, "through no fault of his own, was prevented from availing himself of [administrative remedies]." *Moore*, 517 F.3d 717, 725 (4th Cir. 2008). Where a prisoner contends that he was prevented from exhausting his administrative remedies, the burden is on the prisoner to demonstrate the unavailability of the administrative remedies. *Washington v. Rounds*, ___ F. Supp.3d ___, 2016 WL 7015666, at *5 (D. Md. Nov. 30, 2016) (citing *Graham v. Gentry*, 413 F. App'x 660, 663 (4th Cir 2011) ("[I]n order to show that a grievance procedure was not 'available,' *a prisoner must adduce facts* showing that he was prevented, through no fault of his own, from availing himself of that procedure." (emphasis added))). Examples of actions by prison officials that prevent a prisoner from availing himself of administrative remedies include not processing or responding to a properly filed

grievance, denying an inmate the proper forms to submit a grievance, and failing to provide an inmate information regarding how to properly submit a grievance. *See Ross v. Blake*, 136 S. Ct. 1850, 1859-60 (2016) (concluding that administrative remedies are unavailable where (1) the procedure in place is incapable of use because the administrative entity designated to receive grievances disclaims the ability to process grievances, (2) the administrative scheme is "unknowable" or "so opaque that it [is] incapable of use," or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation"); *see also Washington*, 2016 WL 7015666, at *5 (collecting cases identifying various reasons why administrative remedies were unavailable to prisoners); *Widener v. City of Bristol, Va.*, 2014 WL 109104, at *2 (W.D. Va. Jan 13, 2014) (noting that administrative remedies are unavailable "when prison officials interfere with a prisoner's ability to properly use or follow the administrative process").

The steps a prisoner in a North Carolina state facility must take to exhaust his administrative remedies are governed by NCDPS's Administrative Remedy Procedure. *See Moore*, 517 F.3d at 721 (discussing steps for filing grievance under NCDPS Administrative Remedy Procedure). Relevant here, the Administrative Remedy Procedure states that a prisoner seeking to initiate the administrative process must complete a Form DC-410 and transmit by mail or deliver by hand the Form DC-410 "to the Facility Head, designated screening officer, or any other staff member."[11] (Doc. 20-2 at 21, 25). Furthermore, for a prisoner's grievance to be timely, the prisoner must submit his Form DC-410 within ninety days of the alleged events giving rise to

---

[11] An exception to this process for initiating the administrative process exists where a prisoner seeks to file a grievance to address an emergency situation. (Doc. 20-2 at 24). Plaintiff does not argue that the complaints he sought to raise fall within the emergency grievance exception or that he exhausted his administrative remedies by complying with the portion of the Administrative Remedy Procedure pertaining to emergency grievances. (*See* Doc. 32 at 6-8).

his grievance.  *Id.* at 22.  Any grievance submitted outside the ninety-day period is untimely and subject to rejection.  *Id.*

In his affidavit, Plaintiff contends that he submitted two grievances in an attempt to initiate the administrative remedy process: (1) a "grievance letter" that he wrote at 10:00pm on April 6, 2015 and gave directly to Defendant Farris on April 7, 2015; and (2) a Form DC-410 that he completed and submitted on July 26, 2015.  (Doc. 32-1).  In moving for summary judgment, Defendants produced both of the documents identified by Plaintiff.[12]  (*See* Doc. 20-2 at 33-36; Doc. 20-11 at 7).  This Court concludes that neither of Plaintiff's attempts to initiate the administrative process complied with the Administrative Remedy Procedure.  First, the "grievance letter" was not completed on a Form DC-410 as required to initiate the administrative process.  (*See* Doc. 20-11 at 7).  This deficiency is not only important from a procedural compliance standpoint but is also important from a substantive standpoint because Plaintiff's letter seeks a remedy for the electrical outlet issue rather than expressing a desire to initiate the administrative process or to have a grievance screening offer review his complaint.  *See id.*; (*see also* Doc. 20-2 at 25-26 (discussing the role of grievance screening officers including to act as a mediator between staff members and prisoners and to discuss the matter with the prisoner after obtaining a written response from the appropriate staff member).  Second, Plaintiff completed and submitted the Form DC-410 dated July 26, 2015 more than ninety days after the last day he was without an electrical outlet such that the grievance was untimely under the Administrative Remedy Procedure.  Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 18) on the ground that Plaintiff failed to properly exhaust his administrative remedies.  Nonetheless, this Court will alternatively discuss the merits of Plaintiff's claims.

[12] Defendants' production of both "grievances" identified by Plaintiff in his affidavit defeats Plaintiff's contention that prison staff prevented him from exhausting his administrative remedies by destroying his grievances.

In Count One, Plaintiff alleges that each of the Defendants violated his Eighth Amendment right to be free from cruel and unusual punishment because, from March 29, 2015 to April 7, 2015, they failed to provide him an electrical outlet to operate his CPAP machine.  (Doc. 1 at 10-13).  "[T]he Eighth Amendment imposes a duty on prison officials to 'provide humane conditions of confinement and ensure that inmates receive adequate food, clothing, shelter, and medical care.'"  *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)).  An Eighth Amendment claim premised on the failure of prison officials to provide medical care has both an objective component and a subjective component in that plaintiff must demonstrate that he suffered from a "serious medical need" (objective) to which officers acted with "deliberate indifference" (subjective).  *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008).

Under the objective component, where a prisoner alleges that medical care was withheld by prison officials, the prisoner must "demonstrate that the deprivation alleged was, objectively, sufficiently serious."  *Scinto*, 841 F.3d at 225 (internal quotation marks and brackets omitted).  "To be 'sufficiently serious,' the deprivation must be 'extreme'—meaning that it poses 'a serious or significant physical or emotional injury resulting from the challenged conditions,' or 'a substantial risk of such serious harm resulting from exposure to the challenged conditions.'"  *Id.* (elipses omitted) (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)).  "[A] 'serious medical need' is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."  *Iko*, 535 F.3d at 241.

The subjective component of an Eighth Amendment claim based on conditions of confinement "sets a particularly high bar to recovery" that cannot be met by showing negligence

or civil recklessness on the part of the prison official. *Id.*; *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). Instead, a prison official is only deliberately indifferent if the official "'knows of and disregards' the risk posed by the serious medical needs of the inmate." *Iko*, 535 F.3d at 241 (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). To show that a prison official knew of and disregarded the risk posed to the inmate, a plaintiff must show that the prison official (1) had "actual knowledge of the risk of harm to the inmate" and (2) "recognized that his actions were insufficient to mitigate the risk of harm to the inmate arising from his medical needs." *Id.* (emphasis and internal quotation marks omitted).

Based on the record before this Court, and resolving all factual disputes in favor of Plaintiff, Plaintiff satisfies neither the objective component nor the subjective component of an Eighth Amendment claim based on conditions of confinement.

a.     Objective Component

Plaintiff's medical records show that he was diagnosed with *mild*, REM predominant obstructive sleep apnea and obtained a CPAP machine in 2008. (*See* Doc. 20-15 at 3, 32-33; Doc. 20-16 at 3). Between 2008 and 2016, Plaintiff frequently refused service on his CPAP machine. (Doc. 20-15 at 7, 56, 61, 65, 161). In both June 2010 and January 2011, Plaintiff asked to discontinue using the CPAP machine and, in February 2011, Plaintiff reported that using an extra pillow helped him breathe at night more than using the CPAP machine. *Id.* at 8, 40, 62, 64. Plaintiff's medical records also show multiple lapses in Plaintiff's use of a CPAP machine. *Id.* at 89, 110, 130. One three-week lapse occurred in February to March 2015, mere weeks before the events giving rise to this action. *Id.* at 110. Another lapse occurred in December 2015, several months after the events giving rise to this action. *Id.* at 130. During the December 2015 lapse in using his CPAP machine, Plaintiff denied experiencing pain or discomfort and informed medical

staff that he could go "a couple of nights without [the CPAP machine]." *Id.* Furthermore, Plaintiff's medical records do not show any alteration to the air pressure setting on his CPAP machine following his inability to use the CPAP machine between March 29, 2015 and April 7, 2015. *Compare id.* at 102 (indicating CPAP pressure setting of $14cmH_20$ on November 13, 2014), *with id.* at 133 (indicating CPAP pressure setting of $14cmH_20$ on February 16, 2016). Additionally, the only medical professionals to opine on what impact Plaintiff's inability to use his CPAP machine for the nine nights at issue in this action had on his sleep apnea condition stated that Plaintiff's inability to use his machine "did not cause any new medical problems, and did not cause deterioration, or symptoms exacerbation of [Plaintiff's] pre-existing medical disorders."[13] (Doc. 20-15 at 4; *see also* Doc. 20-16 at 3). Lastly, in his response, Plaintiff does not cite to anything in his medical records that contradicts the Defendants' statements about Plaintiff's medical condition or that tends to show that Plaintiff's sleep apnea condition or health declined as a result of not having access to the CPAP machine for nine nights. (*See* Doc. 32).

Based on these records, it is apparent that (1) Plaintiff's sleep apnea presented a mild medical need rather a serious medical need, (2) Plaintiff did not suffer a significant physical injury from the nine nights when he could not use the CPAP machine, as evident by the lack of change in the pressure setting on his CPAP machine and the lack of any records showing that Plaintiff sought medical attention during the nine-night period; and (3) the nine-night lapse at issue in this action cannot be said to have posed a substantial risk of serious harm to Plaintiff, particularly where Plaintiff's sleep apnea was mild in severity where other lapses in Plaintiff's use of his CPAP machine occurred in close proximity to the nine-night lapse at issue in this action and did not

---

[13] Plaintiff objects to physicians at ACI providing opinions regarding the impact of the lapse in his ability to use his CPAP machine but fails to cite any legal authority for why they cannot present their opinions. (*See* Doc. 32 at 5). Where a litigant has counsel, the duty is on the litigant, not the Court, to develop and support his arguments.

produce any significant, reported symptoms. *Cf. Washington v. Thomas*, 264 F.3d 1140 (5th Cir. 2011) (unpublished) (affirming dismissal of Eighth Amendment claim because Plaintiff failed to show that he suffered substantial harm form lack of access to CPAP machine); *Flemming v. LaRose*, 2014 WL 4684910, at *1, 9 (N.D.N.Y. Sept. 19, 2014) (noting prior, longer lapse in use of CPAP machine when determining that lapse at issue in suit did not exacerbate sleep apnea condition and did not present "serious medical need"); *Santana v. Correct Care Solutions, LLC*, 2014 WL 1803308, at *5 (suggesting that diagnosis of "'moderate' sleep apnea" did not rise to the level of a serious medical need and that plaintiff failed to satisfy the objective component of Eighth Amendment claim where he did not identify any evidence showing that his health deteriorated or that he suffered substantial pain from not having CPAP machine). Furthermore, Plaintiff's conclusory allegations of suffering emotional distress and tiredness and of being depressed lack sufficient specificity to permit a jury to conclude that Plaintiff suffered significant emotional injury. (*See* Doc. 32-1 at 3-7). Finally, although Plaintiff contends that he stapled his hand twice as a result of being tired and exhausted from not sleeping, Plaintiff neither provides sufficient attestations about the incident nor corroborates the alleged incident with any documentation so as to permit a jury to conclude that the injury was significant. *See id.* at 4. Accordingly, Plaintiff fails to create a genuine issue of material fact with respect to the objective component of his Count One claim and dismissal of the claim with prejudice is appropriate.

b. Subjective Component

The Court further concludes that no genuine issue of material fact exists as to the knowledge or subsequent indifference of several of the individually named Defendants. As an initial matter, Plaintiff presents no evidence that, between March 29, 2015 and April 7, 2015, Defendants Solomon, Perry, Smith, or White had any knowledge of the events giving rise to this

litigation or of Plaintiff's sleep apnea condition and use of a CPAP machine to treat his sleep apnea condition. Accordingly, the Court alternatively dismisses Plaintiff's Count One claim against Defendants Solomon, Perry, Smith, and White on the ground that Plaintiff has not presented any evidence permitting a reasonable jury to conclude that they were deliberately indifferent.

As to Defendant Farris, Plaintiff's own affidavit demonstrates that Farris learned of Plaintiff's need for an electrical outlet on April 7, 2015 and that Farris informed Plaintiff that same afternoon "that they had made arrangement for [Plaintiff] to sleep downstairs in the Lower Red Unit B Block of the Restricted Housing unit where there was an outlet for [Plaintiff's] machine, until they could install an outlet in [Plaintiff's Red Unit] cell." (Doc. 32-1 at 7-8). Plaintiff was, in fact, moved to the Lower Red Unit B Block on April 7, 2015 and slept there until the electrical outlet was installed in his newly-assigned cell. (Doc. 32-1 at 7-8). Thus, according to Plaintiff's own version of events, Defendant Farris promptly responded to Plaintiff's reported medical need and took effective steps to assure that Plaintiff had an electrical outlet on the same night that Farris learned of Plaintiff's need. Therefore, the Court alternatively dismisses Plaintiff's Count One claim against Defendant Farris on the ground that Plaintiff has not presented any evidence permitting a reasonable jury to conclude that Farris was deliberately indifferent.

As to Defendant Miller, Plaintiff's affidavit indicates that he had a single interaction with Miller on the morning of March 29, 2015, the day Plaintiff was ordered to move cells and before he, or for that fact Miller, could have known whether there was an electrical outlet in his new cell. (*See* Doc. 32-1 at 3). According to Plaintiff's affidavit, Miller indicated that Plaintiff's need for an outlet was not her problem and Miller's affidavit states that she directed Plaintiff to the sergeant-on-duty in the Red Unit. *Id.* at 3; (Doc. 20-5 at 3). Although it is possible that Defendant Miller could have expressed more empathy when speaking with Plaintiff on March 29, 2015, her response

directing Plaintiff to the sergeant-on-duty in the Red Unit, a response Plaintiff does not deny, was an appropriate response reasonably calculated to inform Plaintiff of the individual responsible for overseeing his custody in the Red Unit. Where there is no evidence suggesting that Defendant Miller had any further contact with Plaintiff, the Court alternatively dismisses Plaintiff's Count One claim against Miller on the ground that Plaintiff has not presented any evidence permitting a reasonable jury to conclude that Miller was deliberately indifferent.

v. *Count Two*

In Count Two, Plaintiff alleges that Defendants Solomon, Perry, Smith, Dye, and White violated his Eighth Amendment rights by failing to train ACI prison official regarding how to address medical needs of prisoners. (Doc. 1 at 13-16). "[T]here are limited circumstances in which an allegation of 'failure to train' can be the basis for liability under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 387 (1989). Among the elements for advancing a "failure to train" claim, a plaintiff must show that the allegedly deficient training practices actually caused the deliberate indifference and the ultimate injury plaintiff suffered. *Id.* at 389, 391. Where Plaintiff fails to show that any prison officials at ACI violated his Eighth Amendment rights, he is also unable to demonstrate that any training practice overseen by the Defendants named in Count Two was responsible for any violation of this Eighth Amendment rights.

vi. *Count Three*

Where Plaintiff fails to sustain either his Count One or Count Two claim, his Count Three claim for punitive damages, likewise, fails.

**III.    DECRETAL**

**IT IS, THEREFORE, ORDERED THAT:**

(1)    Defendants' Motion to Strike (Doc. 34) is **GRANTED IN PART** and **DENIED IN PART**;

(2)    Consistent with pages seven through ten of this Order, the Court **STRIKES** the unsworn, draft affidavit of Sergeant Wilson, found at pages 5-7 of Doc. 32-3, and paragraphs 3, 5, 6, 7, 10, 13, 14, 16, 17, 18, 19, 20, 21, 23, and 24 of Ms. Exum's affidavit, found on pages 1-4 of Doc. 32-2.

(3)    Defendants' Motion for Summary Judgment (Doc. 18) is **GRANTED**;

(4)    Counts One, Two, and Three of Plaintiff's Complaint (Doc 1) are **DISMISSED WITH PREJUDICE**; and

(5)    The Clerk is **DIRECTED** to remove this case from the Court's docket.

Signed: May 22, 2017

Richard L. Voorhees
United States District Judge